**Tab 41**



Not Reported in F.Supp.2d                                                     Page 1
Not Reported in F.Supp.2d, 2007 WL 1031263 (N.D.Cal.)
**(Cite as: 2007 WL 1031263 (N.D.Cal.))**

**C**Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Kathleen A. STEWART, individually and on behalf
of all others similarly
situated, Plaintiffs,
v.
AT & T INC, et al., Defendants.
No. C 06-7363 SI.

April 3, 2007.

Scott D. Kalkin, Esq., Roboostoff & Kalkin, San
Francisco, CA, Bradley J. Schram, Eva Teresa
Cantarella, Robert Paul Geller, Hertz, Schram &
Saretsky, P.C., Bloomfield Hills, MI, for Plaintiffs.

Jeffrey D. Wohl, Paul, Hastings, Janofsky & Walker
LLP, San Francisco, CA, for Defendants.

**ORDER GRANTING DEFENDANTS' MOTION
TO TRANSFER VENUE TO WESTERN
DISTRICT OF
TEXAS**

SUSAN ILLSTON, United States District Judge.

*1 Defendants' motion to transfer venue is scheduled
for a hearing on April 6, 2007. Pursuant to Civil
Local Rule 7-1(b), the Court determines that the
matter is appropriate for resolution without oral
argument, and VACATES the hearing. For the
reasons set forth below, the Court GRANTS
defendants' motion and TRANSFERS this action to
the United States District Court for the Western
District of Texas.

**BACKGROUND**
On November 30, 2006, plaintiff Kathleen Stewart
filed this action on behalf of herself and a putative
nationwide class against AT & T and AT & T
Pension Benefit Plan-NonBargained Program. [FN1]
Plaintiff alleges that defendants violated the
Employee Retirement Income Security Act of 1974
("ERISA"), as amended, 29 U.S.C. § 1001et seq., by
amending the AT & T pension plan in such a way
that reduced pension benefits. Complaint ¶ 9.
Plaintiff alleges three ERISA claims on behalf of the

class, and one ERISA claim solely on her own behalf.

FN1. The complaint states that AT & T was
formerly known as SBC Communications
Inc., and that AT & T Pension Benefit Plan-
NonBargained Program was formerly
known as SBC Pension Benefit Plan and
SBC Pension Benefit Plan-NonBargained
Program.

Plaintiff Stewart resides in Ohio, and throughout her
employment with AT & T-- which continues as of
today--plaintiff worked in AT & T's Brecksville,
Ohio office. See Holland Decl. ¶ 4. AT & T is a
Delaware corporation with its principal place of
business in San Antonio, Texas. Id. ¶ 5; see also
Supp. Holland Decl. ¶ 3, Ex. B. [FN2] AT & T is the
Plan's administrator, sponsor, and named fiduciary.
Holland Decl. ¶ 5. The Plan is headquartered in San
Antonio, Texas. Id.

FN2. Plaintiff incorrectly states that AT &
T's corporate headquarters are in San
Francisco, California. Inexplicably, plaintiff
cites the website of an architectural firm as
the source for this information; that website
is not a proper source of information
regarding the location of AT & T's corporate
headquarters, and even if it was, the website
does not contain any such information. See
Plaintiff's Ex. 55 (citing www.gwa-
arch.com/projects/default.asp)

Christine Holland, AT & T's Associate Director,
Benefit Litigation & ERISA Compliance states,
    With one minor exception, nearly all fiduciary
    functions related to the administration of benefits
    payable by the Plan are performed by company
    employees located in San Antonio, and the records
    related to such fiduciary decisions are maintained
    in San Antonio. The one exception: The Benefit
    Plan Committee, which decides all appeals for
    pension benefits, includes Committee members
    located outside of San Antonio, who participate in
    Committee meetings by telephone. Only one of
    these members works in California. The
    Committee itself, the Chairperson of the
    Committee, and the Secretary of the Committee are
    all located in San Antonio. All official Benefit Plan

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2007 WL 1031263 (N.D.Cal.)
(Cite as: 2007 WL 1031263 (N.D.Cal.))

Committee records are located and maintained in San Antonio.
*Id.* ¶ 7.

Holland states that amendments to the Plan are made by the Board of Directors, Board Committees, or by officers or other employees to whom the Board has delegated amendment authority. *Id.* ¶ 8. Holland also states that the AT & T employees responsible for analyzing proposed plan amendments and for making recommendations to those with amendment authority are all located in San Antonio, and all records with respect to such amendments are maintained in San Antonio. *Id.* ¶ 9. The amendments at issue in this case were signed by Karen Jennings, Senior Executive Vice-President, Advertising and Corporate Communications, whose office is located in San Antonio, Texas. *Id.* ¶ 10. Holland also states that "[t]here are no persons or committees responsible for design, administration or amendment of the Plan located at 101, Spear Street, San Francisco, CA 94105 ...." *Id.* ¶ 16.

**LEGAL STANDARD**

*2 "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil matter to any other district or division where it might have been brought." 28 U .S.C. § 1404(a). The purpose of § 1404(a) is to "prevent the waste of time, energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack,* 376 U.S. 612, 616, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) (internal citations and quotation omitted). A motion for transfer lies within the broad discretion of the district court, and must be determined on an individualized basis. *See Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 498 (9th Cir.2000).

To support a motion for transfer, the moving party must establish: (1) that venue is proper in the transferor district; (2) that the transferee district is one where the action might have been brought; and (3) that the transfer will serve the convenience of the parties and witnesses, and will promote the interests of justice. *See Goodyear Tire & Rubber Co. v. McDonnell Douglas Corp.,* 850 F.Supp. 503, 506 (C.D.Cal.1992). Transfer is discretionary, but is governed by certain factors specified in § 1404(a) and in relevant case law.

**DISCUSSION**

As an initial matter, the Court finds that venue would

be proper in either this district or the Western District of Texas. ERISA provides that venue is proper in "the district where the plan is administered, where the breach took place, or where a defendant resides or may be found." 29 U.S.C. § 1132(e)(2). There is no dispute that defendant resides or may be found in both districts, and that the Plan is administered in Texas.

Once venue is determined to be proper in both districts, courts evaluate the following factors to determine which venue is more convenient to the parties and the witnesses: (1) plaintiff's choice of forum, (2) convenience of the parties, (3) convenience of the witnesses, (4) ease of access to the evidence, (5) familiarity of each forum with the applicable law, (6) feasibility of consolidation with other claims, (7) any local interest in the controversy, and (8) the relative court congestion and time of trial in each forum. *See Williams v. Bowman,* 157 F.Supp.2d 1103, 1106 (N.D.Cal.2001).

The Court finds that on balance, these factors favor transfer. Where a plaintiff does not reside in the forum, the Court may afford his choice considerably less weight. *See* Schwarzer et al ., *Federal Civil Procedure Before Trial* § 4:760 (2006). Here, plaintiff Stewart is a resident of Ohio, and she does not appear to have any connection to this district. In addition, "when an individual brings a derivative suit or represents a class, the named plaintiff's choice of forum is given less weight." *Lou v. Belzberg,* 834 F.2d 730, 739 (9th Cir.1987). Furthermore, the Ninth Circuit has established that courts should disregard a plaintiff's forum choice where the suit is a result of forum-shopping. *See Alltrade, Inc. v. Uniweld Products, Inc.,* 946 F.2d 622, 628 (9th Cir.1991). Here, plaintiff states that she chose this district because of favorable Ninth Circuit case law.

*3 The Court further finds that Texas is more convenient for the parties and witnesses, and provides greater ease of access to evidence. To the extent plaintiff suggests that the Court should consider the location of counsel in this analysis, plaintiff is incorrect because Section 1404(a) refers to "parties" and not counsel. *See* 28 U.S.C. § 1404(a); *see also In re. Horseshoe Entertainment,* 337 F.3d 429, 434 (5th Cir.2003) ("The factor of 'location of counsel' is irrelevant and improper for consideration in determining the question of transfer of venue."); *Solomon v. Continental American,* 472 F.2d 1043, 1047 (3d Cir.1974) ("The convenience of counsel is

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031263 (N.D.Cal.)
(Cite as: 2007 WL 1031263 (N.D.Cal.))

Page 3

not a factor to be considered.").

Plaintiff contends that the two districts are equally convenient because plaintiff's claims present "purely legal issues," and because the Court's review is limited to the administrative record. However, defendant asserts that there is no "administrative record" in this case because Stewart never filed a formal claim for benefits, and thus the parties will be required to conduct discovery of witnesses and documents located in Texas. [FN3] Defendants further note that even if plaintiff's inquiries regarding her benefit plan could constitute the "administrative record," plaintiff has not stipulated that an abuse of discretion standard would apply; if the Court's review is *de novo,* the Court would consider evidence and testimony outside the administrative record. *See Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 969-70 (9th Cir.2006).*

> FN3. The complaint alleges that Stewart exhausted her administrative remedies by faxing a letter on November 4, 2002 to SBC's Pension Service Center "requesting an explanation of the 'foundation' (i.e., Plan provision) authorizing the offset methodology and complaining that it was actuarially unsound." Complaint ¶ 43; *see also id.* ¶ 116 (regarding "Administrative Exhaustion"). The complaint also alleges that a December 18, 2002 response from the Pension Service Center was the "Initial Decision," *id.* ¶ 117; that Stewart's December 20, 2002 letter to SBC Vice President Rick Felts constituted an "Appeal," *id.* ¶ 118; and that a June 24, 2004 e-mail from Susan Sroka, who was then SBC's Associate Director for Human Resources, constituted the "Final Decision." *Id.* ¶ 119. Defendants state that they anticipate filing a motion to dismiss and/or stay this action for failure to exhaust administrative remedies.

For purposes of resolving the instant motion, the Court need not decide whether plaintiff filed a formal claim for benefits under ERISA, or what standard of review should govern this case. However, the Court observes that based upon the record before it, it appears that there is a reasonable likelihood that testimony and documentary evidence regarding the Plan amendment may be required. Defendants have submitted evidence that the Plan is designed, amended and otherwise administered from AT & T's headquarters in San Antonio, and that most of the employees responsible for the Plan's fiduciary functions and Plan amendments work and reside in Texas. Plaintiff asserts that because she and six other "endorsers" (individuals identified by plaintiff as also negatively affected by the Plan amendment) live in Ohio, and other percipient witnesses live in Illinois and New Jersey, that both districts are equally convenient. However, even if that is the case, plaintiff does not dispute that virtually all of the individuals responsible for the Plan's fiduciary functions and Plan amendments work and reside in Texas. [FN4]

> FN4. Plaintiff identifies two SBC employees, Tom Sweeney and Christopher Smith, who work in California and who, according to plaintiff, are percipient witnesses. Defendant asserts that Sweeney "has absolutely no involvement with Plan administration," and that Smith, "in order to fulfill his duties as a member of the Benefit Plan Committee, participates in Committee meetings (which take place in San Antonio) by telephone." Reply at 8:14-17. The Court finds that even if Sweeney and Smith are percipient witnesses, transfer is still required because Texas is more convenient for a greater number of witnesses.

The remaining factors are largely neutral in the transfer analysis. Where federal law governs all claims raised, as here, "either forum is equally capable of hearing and deciding those questions." *DealTime.com Ltd. v. McNulty,* 123 F.Supp.2d. 750, 757 (S.D.N.Y.2000). Plaintiff cites the fact that the time from filing to *disposition* is quicker in this district than in the Western District of Texas, while defendants emphasize that the time from filing to *trial* is significantly shorter in Texas; at the outset of the litigation, the Court is unable to predict which statistic is more relevant. Finally, Texas arguably has a greater interest in the controversy due to defendants' residence there and the fact that the Plan is administered there.

## CONCLUSION

*4 For the foregoing reasons and good cause shown, the Court hereby GRANTS defendants' motion to transfer venue, and TRANSFERS this action to the United States District Court for the Western District of Texas. (Docket Nos. 14 & 18).

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031263 (N.D.Cal.)
**(Cite as: 2007 WL 1031263 (N.D.Cal.))**

Page 4

**IT IS SO ORDERED.**

Not Reported in F.Supp.2d, 2007 WL 1031263 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**Tab 42**

Westlaw.

708 F.Supp. 1551                                                                 Page 1
708 F.Supp. 1551
(Cite as: 708 F.Supp. 1551)

CUnited States District Court,
N.D. California.
STX, INC., a California corporation, Plaintiff,
v.
TRIK STIK, INC., a Florida corporation, Defendant.
No. C 88-1765 FMS.

Oct. 12, 1988.

Manufacturer of skateboard kneepad brought trade dress infringement suit against alleged manufacturer and sought preliminary injunction. The District Court, Peckham, Chief Judge, held that: (1) evidence did not demonstrate compelling need to transfer; (2) defendant's declarations were unreliable and did not render suit moot; (3) features of skateboard were nonfunctional; and (4) evidence was sufficient to support grant of preliminary injunction.

Injunction ordered.

West Headnotes

**[1] Federal Courts** ☜═144
170Bk144Most Cited Cases
On motion to transfer, defendant has heavy burden of proof to justify necessity of transfer as plaintiff's choice of forum should not be easily overturned. 28 U.S.C.A. § 1404(a).

**[2] Federal Courts** ☜═106.5
170Bk106.5Most Cited Cases
    (Formerly 170Bk106)
Transfer of suit from Northern District of California to Southern District of Florida was not compelled on grounds of witness convenience; while all six of defendant's witnesses were residents of Florida, four of them were employees of defendant, and all seven of plaintiff's witnesses were residents of California. 28 U.S.C.A. § 1404(a).

**[3] Federal Courts** ☜═143
170Bk143Most Cited Cases
Lack of evidence that docket of Southern District of Florida was less congested than Northern District of California undermined defendant's motion to transfer action to Florida, particularly where suit subsequently filed by defendants in Florida on same issue had not

even been scheduled for a hearing at time hearing was held in Northern District of California. 28 U.S.C.A. § 1404(a).

**[4] Federal Courts** ☜═105
170Bk105Most Cited Cases
In absence of other grounds justifying transfer, location of defendant's records did not supersede plaintiff's choice of forum and allow transfer. 28 U.S.C.A. § 1404(a).

**[5] Federal Courts** ☜═13
170Bk13Most Cited Cases
In light of unreliability of defendant's declarations in trade dress suit and fact that related corporation was not joined as party as result of defendant's machinations, defendant's contested claim that it had stopped manufacturing allegedly infringing product prior to commencement of suit did not render suit moot.

**[6] Trademarks** ☜═1064
382Tk1064Most Cited Cases
    (Formerly 382k349)
In order to show trade dress infringement, plaintiff need not show each and every feature on its product was not functional; rather, product's trade dress as whole was to be considered.

**[7] Trademarks** ☜═1065(1)
382Tk1065(1)Most Cited Cases
    (Formerly 382k43)
Presence of multiple other skateboard kneepads without exact combination of features utilized by trade dress infringement plaintiff illustrated that its trade dress was neither commercially necessary nor central to product's use. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[8] Trademarks** ☜═1065(1)
382Tk1065(1)Most Cited Cases
    (Formerly 382k43)
Fact that features of product's trade dress furthers its use by some degree did not mean that features were not capable of indicating sponsorship or origin for purpose of preliminary injunction in trade dress infringement suit, particularly where decorative aspects were nonfunctional. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

708 F.Supp. 1551
708 F.Supp. 1551
(Cite as: 708 F.Supp. 1551)

Page 2

**[9] Trademarks** ☞1707(6)
382Tk1707(6)Most Cited Cases
(Formerly 382k626)

Market survey demonstrating that 65% of those interviewed associated plaintiff's skateboard kneepad with its tradename on basis of appearance alone was sufficient evidence to show secondary meaning for purpose of preliminary injunction in trade dress infringement suit. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[10] Trademarks** ☞1707(6)
382Tk1707(6)Most Cited Cases
(Formerly 382k626)

Market survey demonstrating that 37% of those interviewed mistook defendant's skateboard kneepad as one manufactured by plaintiff, on appearance alone, and notwithstanding presence of defendant's name on kneepad, as well as young and unsophisticated nature of consumers in market, demonstrated sufficient likelihood of confusion to support preliminary injunction in trade dress infringement suit. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[11] Trademarks** ☞1704(10)
382Tk1704(10)Most Cited Cases
(Formerly 382k620)

In light of demonstration that consumers were likely to be confused, it was inferred that trade dress infringement plaintiff would suffer irreparable harm. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[12] Trademarks** ☞1704(10)
382Tk1704(10)Most Cited Cases
(Formerly 382k620)

Balance of hardships was in favor of plaintiff and supported preliminary injunction in trade dress infringement suit; plaintiff had established reputation, high manufacturer quality control, there was likelihood of consumer confusion, actual lost sales by plaintiff, and defendant had only recently started marketing its product. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**\*1553** Dean D. Pregerson, Bergman & Wedner, Inc., Los Angeles, Cal., for plaintiff.

Maurice B. Pilosof, Beehler, Pavitt, Siegemund, Jagger, Martella & Dawes, Los Angeles, Cal., for defendant.

ORDER

PECKHAM, Chief Judge.

I. INTRODUCTION

Three motions are formally before this court. First, defendant moves to transfer the venue of this action to the Southern District of Florida. The remaining two concern the substantive merits of plaintiff's claims: plaintiff's motion for a preliminary injunction and defendant's motion for dismissal due to failure to state a claim. [FN1]

> FN1. Plaintiff has also requested in memorandum that the court enjoin a subsequently filed action and order Rule 11 sanctions against defendant. In the absence of a motion and briefing, we shall not enjoin the later action but recommend that counsel inform the Southern District of Florida of this order. For similar reasons, we will consider Rule 11 sanctions after a formal motion has been filed.

II. BACKGROUND

This action concerns kneepads used by skateboarders. [FN2] The plaintiff contends that defendant appropriated the appearance of its product. It seeks injunctive relief and damages for defendant's alleged violation of § 43(a) of the Lanham Act, unfair competition, and trademark dilution.

> FN2. Both parties at times imply that elbowpads are also involved in this action. Plaintiff asserts, for example, that defendant's elbow pads also infringe upon its products. Plaintiff's complaint refers solely to kneepads, however. Thus, kneepads are the sole subject of this action.

A. *The Parties*

The plaintiff, STX, Inc. ("STX"), is a California corporation with its principle place of business in Santa Rosa, California. For the past nine years, it has manufactured the leading skateboard kneepad, the "Protector." The "Protector" has been promoted and sold under the trademark Rector, the most prominent line of skateboard products. A separate entity not party to this action has granted plaintiff

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

708 F.Supp. 1551
708 F.Supp. 1551
(Cite as: 708 F.Supp. 1551)

exclusive license to use the trademark Rector on STX's kneepads.

The defendant, Trix Stik, Inc. ("Trik Stik"), is a Florida corporation with its principle place of business in Pampano Beach, Florida. The president of Trik Stik, Mr. Norman Levine, formed the corporation to market a stick-like sports device whose patent is still pending. Declaration of Norman Levine, paragraph 3, dated August 23, 1988. Prior to the formation of Trik Stik, Mr. Levine had distributed the "Protector" kneepad for another Florida-based business. Declaration of Pat McGirr, paragraph 8. The defendant began producing its own skateboard kneepad, "Dr. Bone-Saver," sometime in early 1988.

Plaintiff now seeks to join as a defendant a third party, NDL Products, Inc. ("NDL"). NDL is the parent corporation and sole stockholder of defendant, Trik Stik. Both are represented by the same attorney, Mr. Eugene Malin. Apparently, NDL now manufactures and sells the "Dr. Bone-Saver" kneepad. *See,* Second Declaration of Norman Levine, paragraph 4. Mr. Levine currently asserts that defendant Trik Stik transferred the marketing and sale of "Dr. Bone-Savers" to NDL on or before April 1, 1988. Second Levine Declaration, paragraph 7. In a signed declaration dated *1554 June 21, 1988, however, Mr. Levine stated: "Trik Stik, Inc. does its business by selling knee and elbow pads to its dealers by telephone." First Levine affidavit, paragraph 4. Defendant has not provided any reason for the original mistake. In addition, Plaintiff challenges defendant's claim that it no longer sells "Dr. Bone-Savers." Plaintiff's vice-president and general manager states that he witnessed a Trik Stik booth displaying "Dr. Bone-Savers" for sale at a major sports trade show on September 10, 1988--four months after defendant contends sales ceased. Supplementary Declaration of Amnon Rodan, paragraph 5.

B. *The Claim*

In this action, plaintiff seeks trademark protection for the "unique appearance" of the "Protector" kneepad. The "Protector's" product configuration is not the subject of a patent or trademark registration. Plaintiff asserts, however, that defendant has deceitfully replicated the shape, style, and appearance of its kneepad and thus violated § 43(a) of the Lanham Act.

This appearance consists of the particular combination of eight individual features:
(1) the white knee cap on the pad, (2) six brass rivets attaching the cap to the cloth kneepad, (3) bright red fabric, (4) stitching pattern, (5) two blue elastic belts, (6) yellow strap connector connecting the elastic belt to the fabric at the front of the pad, (7) trademark area on top of pad, and (8) rear elastic backing with three-eighths inch horizontal line pattern. [FN3]

> FN3. As detailed in plaintiff's complaint, this appearance is as follows:
> The Protector pads are characterized by a unique appearance that includes a distinctively designed white cap that is attached with six brass rivets on the sides of the cap, to a bright red Cordura, or similar material fabric, with a unique stitching pattern. Each pad is attached to the skateboarder with the use of two blue elastic belts which adjust with a hook and loop (Velcro) material. The upper blue elastic strap is attached to the front of the pad with a bright yellow hook and loop (Velcro) strap that extends across the front of the pad in a unique and distinctive manner. Each white cap has a distinctive area in the upper portion of the cap, where the trademark is placed. The rear of the pads contain a stretchable, almost transparent, elastic backing, which has a pattern of horizontal lines, approximately three-eights of an inch apart.
> Plaintiff's Complaint, Paragraph 5.

Defendant's Motion to Dismiss, page 2. Defendant's product, "Dr. Bone-Saver," contains all eight features. In contrast, at least seven other skateboard kneepads submitted to this court do not contain this particular combination of features. The parties agree that defendant has placed the label "Dr. Bone-Savers" in a prominent place on its product.

The "Protector" is the leading skateboard kneepad, generating over $1,000,000 in annual sales. Plaintiff began marketing the "Protector" nine years ago and considers it the "flagship" of its business. As part of the well-known RECTOR line of products, the "Protector" knee-pads are distributed through a national network of wholesale distributors. Skateboard magazines have used hundreds of

photographs of the Protector kneepad, both in paid advertisements and in feature articles. Rodan Declaration, paragraphs 15. Clothing manufacturers have used RECTOR kneepads in advertisements to further their product's attractiveness to consumers. Rodan Declaration, paragraph 16.

The defendant introduced "Dr. Bone-Savers" early in 1988 and the product has generated approximately $60,000 in sales. Plaintiff has identified twenty-one stores in California that carry defendant's product. One distributor of the "Protector" cancelled his sales contract with plaintiff when it began carrying "Dr. Bone-Savers." The "Protector" sells for $35.95; "Dr. Bone-Saver" sells for approximately half that amount.

To support its contention that the "Protector" is nationally recognized, plaintiff has submitted an extensive market study (the "Ford" study) of consumer associations with skateboard kneepads. Following the interviews with 712 teenage skateboarders, the plaintiff's study concludes that 65% of the youngsters interviewed associated the plaintiff's kneepad with its *1555 trademark name on the basis of appearance alone. The survey further concludes that 37% of the interviewees shown the defendant's product in its original packaging believed it was manufactured by plaintiff.

### C. *The Proceedings*

On May 12, 1988, plaintiff STX filed its complaint against the defendant Trik Stik in the Northern District of California (the "California action"). On June 28, 1988, the defendant filed two motions: (1) for summary judgment or, in the alternative, for dismissal for failure to state a claim, and (2) for transfer of venue to the Southern District of Florida. In a telephone conference on July 15, 1988, the parties and the court agreed to continue defendant's motions. Plaintiff states that it learned for the first time that NDL was the parent corporation of the defendant in preparation for this conference. At the telephone conference, the plaintiff notified Mr. Eugene Malin, counsel for both NDL and Trik Stik, that plaintiff would seek to join NDL as a defendant in the action. Mr. Malin refused to stipulate that plaintiff could amend the complaint to join NDL.

One day prior to the telephone conference (July 14, 1988), NDL had filed an action in the Southern

District of Florida against the plaintiff. Counsel for NDL, Mr. Malin, did not inform the court or opposing counsel that he had filed this action during the telephone conference the following day. In the Florida action, NDL seeks a declaratory judgment to enjoin STX, the California plaintiff, from "claiming that [NDL] infringes [upon STX's] alleged trademark." Florida Complaint at 3. NDL has since moved for summary judgment in the Florida action based on the same claims the defendant has made in the instant proceeding. Plaintiff has moved to dismiss the Florida action based on the doctrine of comity. The Florida court has neither ruled nor scheduled a hearing on these motions.

On August 15, the plaintiff moved to enjoin the defendant from further sales of its kneepad. We scheduled this motion to be heard at the same time of defendant's motion to dismiss. The defendant then sought to supplement its declarations in support of its motion for summary judgment. We denied this request on August 22. On August 25, defendant then withdrew its motion for summary judgment. Defendant specified that it did not withdraw the motion to transfer venue or the motion to dismiss for failure to state a claim.

In the memorandum attached to this motion, defendant Trik Stik stated for the first time that it had ceased by April 1, 1988 all sales of "Dr. Bone-Savers." Defendant did not mention in this memorandum that NDL was now producing the kneepad. Defendant identified NDL as the current manufacturer of "Dr. Bone-Saver" for the first time in the Second Declaration of Mr. Levine accompanying defendant's response to the request for preliminary injunction filed August 30. Defendant contended in this response that a preliminary injunction should not be granted since "the [d]efendant permanently ceased selling the forms of alleged product design trademark almost forty-four days prior to this suit being filed."

On September 1, 1988, plaintiff filed a motion for leave to amend the complaint to allow joinder of NDL as a defendant. This motion shall be heard on October 17, 1988.

### III. DISCUSSION

#### A. *Transfer of Venue*

28 U.S.C. § 1404(a) provides:
    For the convenience of the parties and witnesses, in

708 F.Supp. 1551
708 F.Supp. 1551
**(Cite as: 708 F.Supp. 1551)**

Page 5

the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought.

Since defendant is a Florida corporation, this action could have been brought in Florida. We therefore have the authority to transfer the proceeding if we find that it furthers the convenience of the parties and witnesses and the interests of justice.

[1] In seeking to transfer a case to a different district, a defendant bears a heavy burden of proof to justify the necessity of the transfer. The plaintiff's choice *1556 of forum should not be easily overturned. *Shutte v. Armco Steel Corporation,* 431 F.2d 22, 25 (3rd Cir.1970); *Gallery House, Inc. v. Yi,* 587 F.Supp. 1036 (N.D.Ill.1984). As the Ninth Circuit has stated, "the defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 843 (9th Cir.1986). If the gain to convenience to one party is offset by the added inconvenience to the other, the courts have denied transfer of the action. *See, e.g., Gallery House,* 587 F.Supp. at 1040. The defendant offers three reasons for transferring the action to Florida: the added convenience to its witnesses, the allegedly less congested docket in the Southern District of Florida, and the easier access to proof. We shall address each in turn.

[2] Defendant first argues that transfer will further the convenience of the witnesses. To support this contention, defendant notes that its six witnesses all live in the Southern District of Florida. The defendant suggests that "the likelihood of Florida witnesses ... appearing in a California court is extremely small." Defendant's Memorandum of Law on Motion to Strike or in the Alternative Motion to Transfer Venue at 12. As support for the motion, this contention is insufficient. First, plaintiff's witnesses would be equally inconvenienced by transfer. Plaintiff notes, for example, that the seven witnesses it has identified at this time all reside in California. Plaintiff's Opposition to Motion to Transfer Venue at 8. Moreover, defendant's claim that defense witnesses could not be expected to appear at trial must be discounted since at least four of the six witnesses are defendant's employees whom defendant can compel to testify. *See, Galonis v. National Broadcasting Co.,* 498 F.Supp. 789, 793 (D.N.H.1980) (discount inconvenience to party's witnesses when they are employees who can be compelled to testify).

[3] Defendant next asserts that transfer to the apparently less congested courts in the Southern District in Florida would further the interest of justice. Defendant offers no evidence that the dockets in Florida are less congested. Given that the Southern District of Florida has not scheduled or heard any motions in the case filed by NDL, defendant's assertion appears meritless. Moreover, the case authority is mixed regarding whether docket congestion is even a valid consideration. *See, Fannin v. Jones,* 229 F.2d 368, 369-70 (6th Cir.), *cert. denied* 351 U.S. 938, 76 S.Ct. 834, 100 L.Ed. 1465 (1956).

[4] Finally, defendant contends that the presence of its records in Florida justifies transfer. In the absence of any other ground to justify transfer, the location of Defendant's records in Florida falls woefully short of the grounds necessary to justify superseding the plaintiff's choice of forum. In the case at hand, moreover, transfer would impede access to plaintiff's records which will also be relevant.

Since the defendant can demonstrate no strong reasons for transfer, the plaintiff's choice of forum will be honored. The defendant's motion to transfer venue is denied.

*B. Preliminary Injunction*

[5] Prior to discussing the merits of plaintiff's motion, we must address defendant's contention that the request is moot since defendant allegedly ceased sales of "Dr. Bone-Saver" prior to the filing of the complaint. We reject this claim for several reasons.

First, we question defendant's assertion. In a signed declaration, the plaintiff's vice-president and general manager stated that he witnessed a Trik Stik booth displaying "Dr. Bone-Savers" for sale at a major sports trade show on September 10, 1988--four months after defendant allegedly halted all sales. Defendant failed to provide any indication that such information was inaccurate either in writing or at hearing. Moreover, defendant originally represented that it did continue to manufacture and distribute "Dr. Bone-Savers", changing its story only recently in these proceedings. Since defendant's declarations have not *1557 proven reliable, we have significant reason to doubt defendant's representations.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Second, even if NDL rather than the defendant currently sells "Dr. Bone-Savers," plaintiff should still be allowed to proceed with its motion. Plaintiff has failed to join NDL solely due to the machinations of the defendant and NDL. If we were not to allow plaintiff to proceed, we would reward the defendant and NDL for failing to represent accurately information concerning the manufacture of their kneepad. Consequently, we shall review plaintiff's motion for a preliminary injunction. [FN4]

> FN4. For the purposes of this memorandum, we will continue to refer to the defendant's continued manufacture of "Dr. Bone-Savers." Although it appears that defendant does continue to sell the product, we cannot reach this conclusion without further evidence and thus use the term for the sake of convenience.

The Ninth Circuit in *Model Rectifier Corp. v. Takachiho Int'l, Inc.,* 709 F.2d 1517, 221 USPQ 502 (9th Cir.1983) stated the standard for preliminary injunctions in trade mark actions:

> The party who seeks a preliminary injunction to stop a trademark infringement must show either: (1) probable success on the merits and irreparable harm, or (2) that serious questions are raised and the balance of hardships tip sharply in favor of the party requesting relief. *Miss Universe, Inc. v. Flesher,* 605 F.2d 1130, 1134 (9th Cir.1979).

The court has further made clear that these "are not two distinct tests, but rather the opposite ends of a single continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987). Thus, we review the probability of success on the merits and the balance of hardships.

*1. Probability of Success on the Merits*

To establish probable success on the merits in an action for trade dress infringement, the plaintiff must demonstrate the trade dress of its product is protectable. "Trade dress" refers to the appearance of the product and may include features such as size, shape, color, color combinations, texture, or graphics. *Rachel v. Banana Republic, Inc.,* 831 F.2d 1503, 1506 (9th Cir.1987). The plaintiff must establish that the appearance of its product: (1) is nonfunctional, (2) has acquired secondary meaning, and (3) is likely to be confused with the "Dr. Bone-

Saver" kneepad manufactured by defendant. *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir.1987).

a. Functionality

The central contention between the parties concerns whether the particular combination of features allegedly copied by defendant constitutes a functional trade dress. Plaintiff bears the burden of proof to establish non-functionality. *Rachel,* 831 F.2d at 1506. [FN5]

> FN5. The defendant suggests that it may seek Rule 11 sanctions for plaintiff's mistaken statement, later corrected, that it did not have the burden of proof. Such a threat is inappropriate. It is defendant's behavior that is questionable in this action.

This circuit has adopted the "utilitarian" rather than the "aesthetic" functionality test. *First Brands,* 809 F.2d at 1382, n. 3. As the Ninth Circuit recently stated, "[a] product feature is functional if it is essential to the [product's] use ... or if it affects the cost or quality of the article [citation omitted]." *Id.* at 1381. The standard looks toward the function of the design feature: it will be considered functional if it improves performance, provides economy of manufacture, or in some other manner "furthers the usefulness of the product ... it adorns." *Vuitton Et Fils, S.A. v. J. Young Enterprises, Inc.,* 644 F.2d 769, 774 (9th Cir.1981). *See also, Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417 (5th Cir.1984). The courts have applied this standard to strike the appropriate balance between protection of an individual's investment and the furtherance of free competition. The appropriate inquiry is, therefore, whether protection of the particular appearance "will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods." *In re *1558Morton-Norwich Products, Inc.,* 671 F.2d 1332, 1342 (CCPA Cir.1982).

[6] As a preliminary matter, we emphasize that the trade dress at issue is neither the "Protector" kneepad as a whole nor individual design features. As a matter of law, a product's trade dress must be analyzed as a whole. *First Brands,* 809 F.2d at 1381. Plaintiff in its complaint states the combination of individual characteristics that constitute the trade dress at issue:

> The Protector pads are characterized by a unique appearance that includes a distinctively designed

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

708 F.Supp. 1551
708 F.Supp. 1551
(Cite as: 708 F.Supp. 1551)

white cap that is attached with six brass rivets on the sides of the cap, to a bright red Cordura, or similar material fabric, with a unique stitching pattern. Each pad is attached to the skateboarder with the use of two blue elastic belts which adjust with a hook and loop (Velcro) material. The upper blue elastic strap is attached to the front of the pad with a bright yellow hook and loop (Velcro) strap that extends across the front of the pad in a unique and distinctive manner.

Plaintiff's Complaint, Paragraph 5. At the outset, therefore, we dismiss defendant's assertion that "plaintiff must show each and every feature is a non-functional feature" in order to meet its burden.

[7] Plaintiff makes two showings to support its claim of non-functionality of the combination of individual features detailed above. First, plaintiff notes the presence of multiple other kneepads that serve the same function at the same or lower price without the "Protector's" trade dress. Plaintiff has submitted to the court at least seven other kneepads that do not have this particular combination of features. Second, plaintiff notes that defendant's "Bone-Saver" does have the particular configuration of the "Protector." As visual inspection makes clear, both have the eight particular features identified in plaintiff's complaint. These include, for example, the blue and yellow Velcro straps at top and bottom, red material on the front with blue backing, and six brass rivets to connect a white circular protective face to the pad. [FN6]

> FN6. Defendant appears to acknowledge this in its motion to dismiss. In this motion, defendant argues that the features are functional and the claim should therefore be dismissed. Defendant then mistakenly analyzes each of the eight features independently to determine whether it is functional. Thus, defendant appears to concede that the two pads do not differ as to any of these features.

In the instant case, it is clear that the "Protector" trade dress described above does not serve a utilitarian purpose. The presence of multiple other kneepads without the exact combination of features illustrates that the trade dress is neither a commercial necessity nor "essential to the product's use." Alternative configurations can and do provide an equivalent function. Further, the price range of the alternative kneepads illustrates that the "Protector's"

trade dress is not necessary to promote economy of manufacture or some other purpose that provides the plaintiff with a functional competitive advantage.

[8] Plaintiff acknowledges that each feature independently furthers the kneepads function. This fact is not relevant to the appropriate analysis, however. *See, Dallas Cowboys, Etc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200,203-04 (2nd Cir.1979) ("the fact that an item serves or performs a function does not mean that it may not at the same time be capable of indicating sponsorship or origin, particularly where the decorative aspects are non-functional). Clearly, no kneepad could exist without some means to connect it to the leg such as the Velcro straps or a strong protective fabric such as the plastic cap. The trademark is claimed not for these individual elements but for the particular combination of features. This configuration serves to distinguish the "Protector" from rival kneepads rather than to protect the skateboarder's knees. Thus, we can conclude that the particular configuration of the "Protector" is non-functional. A contrary finding would prevent any trademark from being established if it in any way furthered the product's function. This circuit has explicitly rejected such an interpretation of functionality. *Viutton,* 644 F.2d at 773 *1559 (rejecting "important ingredient in commercial success" test of functionality).

Defendant's twin arguments that the configuration is functional both miss the mark. Citing *Pagliero v. Wallace China Co.,* 198 F.2d 339 (9th Cir.1952), defendant first contends that the combination of features are functional because they "satisfy a demand for the aesthetic as well as the utilitarian." *Id. at 343.* As the above discussion makes clear, defendant has misstated the appropriate standard. The Ninth Circuit has clearly rejected defendant's interpretation of the cited language. *First Brands,*809 F.2d at 1382;*Viutton,* 644 F.2d at 773. Defendant also relies upon a line of cases holding specific colors to be functional. This argument is puzzling since plaintiff seeks trademark protection for the particular configuration of its kneepad rather than its specific color composition.

The court therefore concludes that plaintiff has met its burden of showing non-functionality.

### b. Secondary Meaning

A product's trade dress attains secondary meaning when the purchasing public associates the dress with

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

a single producer or source rather than just the product itself. *First Brands,* 809 F.2d at 1383. The consumer's attitude toward the product provides the strongest evidence of such an association. *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1015 (9th Cir.1985).

[9] The plaintiff has provided such evidence through the Ford market survey. This survey concludes that 65% of those interviewed associated plaintiff's kneepad with its trademark name on the basis of appearance alone. Traditionally, percentages above 50% have constituted evidence of a significant association. MCCARTHY, TRADEMARK AND UNFAIR COMPETITION, § 32:54 (2d Ed.1984). Defendant asserts only that the study does not measure public association at the time defendant began marketing Dr. Bone-Savers. Given defendant's inconsistency with regard to the initiation of marketing its product, this contention seems disingenuous. With regard to its merits, defendant has not provided any evidence that suggests that this study does not validly reflect the associations eight months before it was conducted. Plaintiff's product had been on the market for nine years and had generated substantial market identity prior to the introduction of defendant's product. It is unrealistic to expect a plaintiff to generate market studies until a potential infringer is discovered.

For the purposes of the preliminary injunction, we conclude that plaintiff has sufficiently established that the configuration of the "Protector" has acheived secondary meaning.

### c. Likelihood of Confusion

[10] The third necessary element is the likelihood of confusion. "Regardless of how much secondary meaning it possesses, a product's trade dress will not be protected from an imitator that is sufficiently different to avoid such confusion." *First Brands,* 809 F.2d at 1383. The test is whether there is a likelihood of confusion resulting from the total effect of the defendant's product and package on the eye and mind of an ordinary purchaser. *Id.*

Defendant contends that the display of its label on the product saves it from being confused with the "Protector." It cites a case involving two champaign companies in which the court concluded: "the labels of the two bottles were so dissimilar as to rule out any possibility of confusion" in the minds of the consuming public. *Freixenet, S.A. v. Admiral Wine & Liquor,* 731 F.2d 148, 151 (3rd Cir.1984). Even this citation, however, emphasizes that the relevant determination is the possibility of confusion in the mind of the consumer.

Plaintiff demonstrates such a likelihood of confusion again through the Ford market survey. That study found that 37% of the interviewees shown the defendant's product in its original packaging believed it was manufactured by plaintiff. Such a finding is to be expected. The consumer of the skateboard kneepad is likely to be **\*1560** young and unsophisticated (at least when compared to champagne purchasers). The two products are virtually identical except for the label, and the label itself provides no indication that plaintiff is not the manufacturer. In this context, it is unrealistic to expect the name alone to differentiate the two goods. In the absence of any evidence to the contrary, plaintiff has fulfilled its burden of demonstrating the likelihood of confusion.

### 2. *Balance of Hardships*

[11] The second prong of the test for preliminary injunction requires the court to evaluate whether the balance of hardship favors the movants or whether there is a possibility of irreparable injury. In light of our conclusion that the products are likely to be confused, we can infer that plaintiff will suffer irreparable injury.

> Where there is substantial probability of confusion because of defendant's use of the same or a confusingly similar trademark, irreparable injury ordinarily follows. Confusion may cause injury to business reputation and loss of sales, and there may be no meaningful, proveable monetary recovery available.... Damage to an intangible value such as reputation and goodwill can never be accurately ascertained. Such damage may well occur if the quality of the products sold under the infringing mark is inferior to those of the plaintiff.

GILSON, TRADEMARK PROTECTION AND PRACTICE § 8.07[1]. This inference is borne out by the instant situation.

[12] The reputation plaintiff has developed for a quality product is threatened by the continued sale of "Dr. Bone-Savers." Throughout the nine years of production, plaintiff has manufactured the product in California at added expense to maintain quality control. Defendant manufactures its product overseas and sells it for half the price of the

708 F.Supp. 1551
708 F.Supp. 1551
(Cite as: 708 F.Supp. 1551)

"Protector." Defendant has not challenged the clear implication that "Dr. Bone-Savers" are made of lesser quality material and with fewer controls. In light of the likelihood of confusion, plaintiff has made a sufficient showing that it risks its reputation of high quality products if defendant's kneepad continues to be sold.

Plaintiff has also suggested that it will suffer a loss of sales. Although we cannot determine that all of defendant's sales were due to the confusion over the products, plaintiff did lose at least $31,000 in sales when one distributor switched from plaintiff's to defendant's product. Plaintiff's Memorandum in Support of Preliminary Injunction at 31. Whatever the current loss of sales, defendant's continued sale of its product imposes greater hardship on plaintiff than defendant. The "Protector" is plaintiff's leading product, generating over $1,000,000 in annual sales. Defendant has only recently started selling the product and has not made an equivalent investment.

We therefore conclude that plaintiff has demonstrated that it suffers the balance of hardships and that the possibility of irreparable harm exists.

3. *Conclusion*

We conclude that plaintiff has demonstrated both a probability of success on the merits and the possibility of irreparable harm. The motion for preliminary injunction is granted. Defendant advances the same rationale in its motion to dismiss. Given our conclusion above, we find this motion meritless. Defendant's motion to dismiss is denied.

## IV. ORDER

We hereby enjoin defendant, during the pendency of this action, from producing, manufacturing, distributing, marketing, selling, offering for sale, promoting, advertising, or otherwise exploiting in any manner, any kneepad of a design identical, or almost identical, to those of the plaintiff which, by imitation, color, or otherwise are likely to be mistaken for or confused with the "Protector" kneepad manufactured by plaintiff.

This order is binding upon the parties, its officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive *1561 actual notice of this order by personal service or otherwise.

The defendant shall immediately give written notice of this order to all persons or entities engaged in active concert or participation with defendant in producing, manufacturing, distributing, marketing, selling, or offering for sale, promoting, or advertising the kneepad(s) manufactured by defendant.

Defendant's motion to transfer venue is denied for the reasons stated above.

IT IS SO ORDERED.

708 F.Supp. 1551

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**Tab 43**

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1230214 (D.Md.)
**(Cite as: 2005 WL 1230214 (D.Md.))**

**C**Only the Westlaw citation is currently available.

United States District Court,
D. Maryland, Northern Division.
Marc L. UGOL Plaintiff,
v.
NEMACOLIN WOODLANDS INC., d/b/a
Nemacolin Woodlands Resort and Spa Defendant.
**No. Civ. WDQ-04-3398.**

May 24, 2005.

Brett Ingerman, Michelle Jeanine Dickinson, DLA
Piper Rudnick Gray Cary US LLP, Baltimore, MD,
for Plaintiff.

Barrett W. Freedlander, Edward Joseph Baines,
Nicole Pastore Klein, Saul Ewing LLP, Baltimore,
MD, for Defendant.

MEMORANDUM OPINION AND ORDER

QUARLES, J.

*1 In this diversity action, Marc L. Ugol has sued
Nemacolin Woodlands Inc., d/b/a Nemacolin
Woodlands Resort and Spa ("Nemacolin") for
personal injuries he sustained in a snow tubing
[FN1] accident. Pending is Nemacolin's motion to
transfer venue. For the following reasons,
Nemacolin's motion to transfer will be granted.

> FN1. The sport of snow tubing involves
> sitting on a large inner tube and sliding
> down the relatively narrow confines of a
> snow-covered run or trail. See Def. Mot. at
> p. 2.

BACKGROUND

On February 16, 2004, Marc L. Ugol, a Maryland
resident, was injured while snow tubing at
Nemacolin, located in Farmington, Pennsylvania. See
Complaint at ¶¶ 1, 3 and 4. Ugol alleges that his
injuries are due to Nemacolin's failure to properly
design and maintain the snow tubing run. Id. at ¶ 6.

On September 21, 2004, Ugol filed a complaint in
the Circuit Court for Baltimore City and the case was
subsequently removed to this Court. At trial,

Nemacolin intends to call several witnesses, the
majority of whom live in or within 100 miles of the
Western District of Pennsylvania. See Def. Rply. Ex.
2. Nemacolin, therefore, maintains that the Western
District of Pennsylvania is a more appropriate forum.

ANALYSIS

28 U.S.C. § 1404(a) provides that "for the
convenience of the parties and witnesses, in the
interest of justice, a district court may transfer any
civil action to any other district or division where it
might have been brought." The burden is on the
moving party to show that transfer to another forum
is proper. Lynch v. Vanderhoeff Builders, 237
F.Supp.2d 615, 617 (D.Md.2002). The decision
whether to transfer is committed to the sound
discretion of the Court. Southern Ry. Co. v. Madden,
235 F.2d 198, 207 (4th Cir.1956).

To determine whether a motion to transfer should be
granted, the Court must consider the following: (1)
the weight accorded the plaintiff's choice of venue,
(2) witness convenience and access, (3) convenience
of the parties, and (4) the interest of justice. Lynch,
237 F.Supp.2d at 617. In considering these factors,
transfer of this action seems appropriate.

(A) Plaintiff's Choice of Venue

While a plaintiff's choice of forum is ordinarily
accorded considerable weight, "the plaintiff's choice
of forum is given little weight when none of the
conduct complained of occurred in the forum selected
by the plaintiff and said forum has no connection
with the matter in controversy." Dicken v. U.S., 862
F.Supp. 91, 93 (D.Md.1994) (quoting Mims v.
Proctor and Gamble Distributing Co., 257 F.Supp.
648, 657 (D.S.C.1966)). As the alleged tortuous
conduct did not occur in Maryland, Ugol's forum
choice is entitled to only limited deference. See id.

(B) Witness Convenience and Access

A second factor supporting transfer is convenience
and access of crucial witnesses to the Defendant's
proposed forum. The majority of the crucial
witnesses, with the exception of the Plaintiff, reside
within the immediate or surrounding vicinity of the
Western District of Pennsylvania. Such witnesses

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1230214 (D.Md.)
**(Cite as: 2005 WL 1230214 (D.Md.))**

include Nemacolin employees and medical personnel. *See* Def. Rply. Ex. 2. The Nemacolin employees will testify regarding the run's design and maintenance and the rendering of first aid assistance after the Plaintiff's accident, and the medical personnel will testify about their immediate involvement with Plaintiff after his accident. *See id.*

**\*2** The Plaintiff also contends that his witnesses would be inconvenienced by a transfer. These witnesses, however, include family members and friends who did not witness the accident. *See* Def. Mot. Ex. 1. The Plaintiff also plans to call as potential witnesses his physicians who rendered follow-up care. These physicians, however, are not as crucial as the other medical personnel located in the immediate or surrounding vicinity of the Western District of Pennsylvania. The Plaintiff's physicians only rendered follow-up care, not immediate medical attention. *See* Plain. Opp. Ex. 1. Additionally, such testimony could be presented at trial by means of a videotaped deposition taken in Maryland. *See Dicken,* 862 F.Supp. at 913. A greater number of crucial witnesses, therefore, would be convenienced by a transfer to Pennsylvania. Moreover, as a practical matter, this Court could not compel the appearance of the majority of the Defendant's witnesses because they do not reside within 100 miles of the Court. *See* F.R.C.P. 45(b)(2).

(C) Convenience of the Parties

The third element also favors transfer. As the Plaintiff has traveled to Pennsylvania on a previous occasion, it would not appear that he would be inconvenienced by a transfer. *See Dicken,* 862 F.Supp. at 93.

(D) Interest of Justice

The final element includes, "the court's familiarity with applicable law". *Board of Trustees, Sheet Metal Workers National Fund v. Baylor Heating & Air Conditioning, Inc.,* 702 F.Supp. 1253, 1260 (E.D.Va.1988). As Pennsylvania law would be applied in this case, the public interest is advanced by having the Western District of Pennsylvania preside over this action. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) (noting public interest in having diversity cases tried in forum familiar with governing law).

CONCLUSION

For the reasons discussed above, the defendant's motion to transfer venue will be granted.

Not Reported in F.Supp.2d, 2005 WL 1230214 (D.Md.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**Tab 44**

Westlaw.

2007 WL 3088142                                                                                                    Page 1
--- F.3d ----, 2007 WL 3088142 (5th Cir.(Tex.))
**(Cite as: 2007 WL 3088142 (5th Cir.(Tex.)))**

**H**Only the Westlaw citation is currently available.

United States Court of Appeals,
Fifth Circuit.
In Re: VOLKSWAGEN OF AMERICA, INC., a
New Jersey Corporation; Volkswagen AG, a
foreign corporation organized under the laws of
Germany, Petitioners.
**No. 07-40058.**

Oct. 24, 2007.

**Background:** Injured motorist and passenger sued automobile manufacturer, alleging that design defects in manufacturer's product had led to injuries suffered in collision. The United States District Court for the Eastern District of Texas, T. John Ward, J., denied manufacturer's motion for change of venue to Northern District of Texas, and denied motion for reconsideration. The Court of Appeals, 223 Fed.Appx. 305, denied manufacturer's petition for writ of mandamus directing District Court to transfer case.

**Holdings:** On rehearing, the Court of Appeals, E. Grady Jolly, Circuit Judge, held that:
(1) on motion for transfer, movant must show only good cause, not that balance of convenience and justice substantially weighs in favor of transfer;
(2) relative ease of access to sources of proof weighed in favor of transfer;
(3) availability of compulsory process to secure attendance of witnesses weighed in favor of transfer;
(4) cost of attendance of willing witnesses weighed in favor of transfer; and
(5) local interest in having localized interests decided at home weighed in favor of transfer.
 Petition granted; remanded with instructions.

**[1] Mandamus** ⟜**1**

250k1Most Cited Cases
Court of Appeals issues writ of mandamus only in absence of other adequate remedies, when federal district court has exceeded its jurisdiction or has declined to exercise it, or when trial court has so clearly and indisputably abused its discretion as to compel prompt intervention by appellate court.

**[2] Mandamus** ⟜**44**
250k44Most Cited Cases
Writ of mandamus is available as limited means to test federal district court's discretion in issuing transfer orders. 28 U.S.C.A. § 1404(a).

**[3] Mandamus** ⟜**44**
250k44Most Cited Cases
Whether writ of mandamus is warranted to correct federal district court's denial of motion to transfer depends on whether district court: (1) correctly construed and applied relevant statutes; (2) considered relevant factors incident to ruling on motion to transfer; and (3) otherwise abused its discretion in deciding motion to transfer. 28 U.S.C.A. § 1404(a).

**[4] Federal Courts** ⟜**104**
170Bk104Most Cited Cases
Private interest factors on motion for change of venue are: (1) relative ease of access to sources of proof; (2) availability of compulsory process to secure attendance of witnesses; (3) cost of attendance for willing witnesses; and (4) all other practical problems that make trial of case easy, expeditious and inexpensive. 28 U.S.C.A. § 1404(a).

**[5] Federal Courts** ⟜**104**
170Bk104Most Cited Cases
Public interest factors on motion for change of venue are: (1) administrative difficulties flowing from court congestion; (2) local interest in having localized interests decided at home; (3) familiarity of forum with law that will govern case; and (4) avoidance of unnecessary problems of conflict of laws or in application of foreign law. 28 U.S.C.A. § 1404(a).

**[6] Federal Courts** ⟜**101**
170Bk101Most Cited Cases

**[6] Federal Courts** ⟜**105**
170Bk105Most Cited Cases

**[6] Federal Courts** ⟜**144**
170Bk144Most Cited Cases
On motion for change of venue, defendant/movant is not required to show that balance of convenience and

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 3088142
--- F.3d ----, 2007 WL 3088142 (5th Cir.(Tex.))
(Cite as: 2007 WL 3088142 (5th Cir.(Tex.)))

Page 2

justice substantially weighs in favor of transfer; instead, although plaintiff's choice of forum is entitled to deference, such choice is not highly esteemed or strongly favored, and in turn movant must show only good cause for granting change of venue. 28 U.S.C.A. § 1404(a).

**[7] Federal Courts** ☞105
170Bk105Most Cited Cases

**[7] Federal Courts** ☞144
170Bk144Most Cited Cases
Weight given to plaintiff's choice of forum on motion for change of venue corresponds with burden that defendant/movant must meet to demonstrate that transfer should be granted; choice of forum does not raise presumption. 28 U.S.C.A. § 1404(a).

**[8] Courts** ☞90(2)
106k90(2)Most Cited Cases
When panel opinions appear to conflict, Court of Appeals follows earlier opinion.

**[9] Federal Courts** ☞113
170Bk113Most Cited Cases
Relative ease of access to sources of proof weighed in favor of transfer, in products liability/design defect action brought against automobile manufacturer by motorist and passenger injured in collision; all documents and physical evidence relating to collision, and site of collision, were located in transferee district, and advancements in copying technology and information storage did not render factor superfluous. 28 U.S.C.A. § 1404(a).

**[10] Federal Courts** ☞113
170Bk113Most Cited Cases
Availability of compulsory process to secure attendance of witnesses weighed in favor of transfer, in products liability action brought against automobile manufacturer by motorist and passenger injured in collision; transferee district enjoyed absolute subpoena power for both depositions and trial, which transferor district did not, and fact that transferor court could deny motions to quash subpoenas and compel attendance of third-party witnesses did not alter convenience analysis. 28 U.S.C.A. § 1404(a).

**[11] Federal Courts** ☞113
170Bk113Most Cited Cases
Cost of attendance of willing witnesses weighed in favor of transfer, in design defect action brought against automobile manufacturer by motorist and passenger injured in collision; manufacturer submitted list of witnesses important to case, including witness to collision and accident investigator, who lived more than 100 miles from transferor court, i.e. in transferee district where collision site was located. 28 U.S.C.A. § 1404(a).

**[12] Federal Courts** ☞113
170Bk113Most Cited Cases
Local interest in having localized interests decided at home weighed in favor of transfer, in products liability/design defect action brought against automobile manufacturer by motorist and passenger injured in collision; collision, witnesses, two of three plaintiffs and third-party defendant were in transferee district, police and paramedics from transferee district had responded, and automobile had been purchased in transferee district, while there was no relevant factual connection to transferor district. 28 U.S.C.A. § 1404(a).

Danny S. Ashby (argued), Robert H. Mow, Jr., Christopher Donald Kratovil, Hughes & Luce, Dallas, TX, Burgain G. Hayes, Austin, TX, Ningur Akoglu, Ian Ceresney, Herzfeld & Rubin, New York City, for Petitioners.

Michael Charles Smith (argued), The Roth Law Firm, Marshall, TX, Jeffrey T. Embry, Hossley & Embry, Tyler, TX, Thomas Andrew Crosley, San Antonio, TX, for Plaintiffs-Respondents.

Appeal from the United States District Court for the Eastern District of Texas.

Before JOLLY, CLEMENT and OWEN, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

**\*1** Petitioners Volkswagen AG and Volkswagen of America, Inc. (collectively, "Volkswagen"), defendants in the Marshall Division of the Eastern District of Texas, seek a writ of mandamus directing the district court to transfer this case to the Dallas Division of the Northern District of Texas, where the automobile accident and the injuries to the parties occurred. The plaintiffs exercised their privilege to choose the Marshall Division as the forum for their case, but Marshall has no connection to the parties or the facts of the case. For the reasons presented below,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 3088142
--- F.3d ----, 2007 WL 3088142 (5th Cir.(Tex.))
(Cite as: 2007 WL 3088142 (5th Cir.(Tex.)))

we grant Volkswagen's petition for a writ of mandamus and remand with instructions to transfer the case to the Northern District of Texas, Dallas Division.

## I.

On the morning of May 21, 2005, a Volkswagen Golf automobile was struck from behind and propelled rear-first into a flat-bed trailer parked on the shoulder of a freeway in Dallas, Texas. Ruth Singleton was driving the Volkswagen Golf. Richard Singleton was a passenger. Mariana Singleton, Richard Singleton and Ruth Singleton's granddaughter, was also a passenger. Richard Singleton was seriously injured in the accident. Mariana Singleton died as result of her injuries.

Richard Singleton, Ruth Singleton, and Amy Singleton (Mariana's mother) filed suit against Volkswagen in the Marshall Division of the United States District Court for the Eastern District of Texas ("Marshall Division"). The complaint alleged that design defects in the Volkswagen Golf caused Richard's injuries and Mariana's death. Volkswagen filed a third-party complaint against the driver of the vehicle that struck the Singletons, alleging that the Singletons had the ability to sue him but did not, and that his negligence was the only proximate cause of the damages.

Pursuant to 28 U.S.C. § 1404(a), Volkswagen moved to transfer venue to the Dallas Division of the Northern District of Texas ("Dallas Division"). Volkswagen asserted that a transfer was warranted as (1) the Volkswagen Golf was purchased in Dallas County, Texas; (2) the accident occurred on a freeway in Dallas, Texas; (3) Dallas residents witnessed the accident; (4) Dallas police and paramedics responded and took action; (5) a Dallas doctor performed the autopsy; (6) the third-party defendant lives in Dallas County, Texas; (7) none of the plaintiffs live in the Marshall Division; (8) no known party or significant non-party witness lives in the Marshall Division; and (9) none of the facts giving rise to this suit occurred in the Marshall Division. The district court denied the motion, holding that Volkswagen had not satisfied its burden of showing that the balance of convenience and justice weighs substantially in favor of transfer.

Volkswagen then filed a motion for reconsideration, arguing that the district court gave inordinate weight to the plaintiffs' choice of forum and that the district

court failed properly to weigh the venue transfer factors. The district court also denied the motion for reconsideration, for the same reasons presented in its denial of Volkswagen's motion for transfer.

Volkswagen then petitioned this court for a writ of mandamus. In a per curiam opinion, a divided panel of this court denied the petition and declined to issue a writ. In re Volkswagen of Am. Inc., 223 Fed.Appx. 305 (5th Cir.2007). The panel majority held that the district court did not abuse its discretion in denying Volkswagen's motion to transfer. Judge Garza wrote a dissenting opinion, noting that "[t]he only connection between this case and the Eastern District of Texas is plaintiffs' choice to file there; all other factors relevant to transfer of venue weigh overwhelmingly in favor of the Northern District of Texas." Id. at 307 (Garza, J., dissenting).

**\*2** Volkswagen filed a petition for rehearing en banc. The original panel interpreted the petition for rehearing en banc as a petition for panel rehearing, granted it, withdrew its decision, and directed the Clerk's Office to schedule the petition for oral argument. This panel then heard oral argument on the issues raised for review.

## II.

[1][2] "Mandamus is an extraordinary writ. It ... and is not a substitute for an appeal. We will issue the writ only in the absence of other adequate remedies when the trial court has exceeded its jurisdiction or has declined to exercise it, or when the trial court has so clearly and indisputably abused its discretion as to compel prompt intervention by the appellate court." In re Chesson, 897 F.2d 156, 159 (5th Cir.1990). However, although "few litigants have surmounted the formidable obstacles and secured the writ," this court has "recognized the availability of mandamus as a limited means to test the district court's discretion in issuing transfer orders." In re Horseshoe Entm't, 337 F.3d 429, 432 (5th Cir.2003) (internal quotations omitted). We have enumerated standards for determining the propriety of a district court's ruling on a motion to transfer under § 1404(a), and it is these standards that determine the issues raised on appeal in this case.

[3] The Pfizer standards for determining the propriety of a district court's ruling on a motion to transfer ask: (a) Did the district court correctly construe and apply the relevant statutes; (b) Did the district court consider the relevant factors incident to ruling upon a

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 3088142                                                                      Page 4
--- F.3d ----, 2007 WL 3088142 (5th Cir.(Tex.))
**(Cite as: 2007 WL 3088142 (5th Cir.(Tex.)))**

motion to transfer; and (c) Did the district court abuse its discretion in deciding the motion to transfer. *In re Volkswagen AG,* 371 F.3d 201, 203 (5th Cir.2004) [hereinafter *In re Volkswagen I*]; *Ex parte Chas. Pfizer & Co.,* 225 F.2d 720, 723 (5th Cir.1955).

The *Pfizer* standards require a careful review of "the circumstances presented to and the decision making process used by" the district court. *In re Horseshoe,* 337 F.3d at 432. The standards do not allow us to replace the district court's exercise of discretion with our own. Indeed, we will issue a writ only when there is an abuse of discretion. *In re Volkswagen I,* 371 F.3d at 203. But, again, the *Pfizer* standards do require a careful review of the district court's exercise of its discretion.

### III.

*3 The preliminary question under the change of venue statute, 28 U.S.C. § 1404, is whether the suit could have been filed originally in the destination venue. *Id.* Volkswagen seeks to transfer this case to the Dallas Division of the Northern District of Texas. There is no question but that this suit originally could have been filed in the Dallas Division. *See* 28 U.S.C. § 1391.

[4][5] Further, provisions of § 1404(a) state that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Our precedents indicate that, when considering a § 1404 motion to transfer, a district court should consider a number of private and public interest factors, "none of which can be said to be of dispositive weight." *Action Indus., Inc. v. U.S. Fid. & Guar. Co.,* 358 F.3d 337, 340 (5th Cir.2004). [FN1] The private interest factors are: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen I,* 371 F.3d at 203 (citing *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241 n. 6, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)). The public interest factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law." *Id.*

It is also clear that a plaintiff's choice of forum is one of the several factors to be considered under the § 1404(a) venue transfer analysis. *Ex parte Chas. Pfizer & Co.,* 225 F.2d at 722;*In re Horseshoe,* 337 F.3d at 434. We address this consideration first, and then address the private and public interest factors presented above.

### A.

[6] Volkswagen argues that the district court abused its discretion by applying the wrong legal standard when, giving plaintiffs' choice of forum an elevated status, it stated that the moving party must show that the balance of convenience and justice *substantially* weighs in favor of transfer. This standard, Volkswagen argues, reflects the much stricter forum non conveniens dismissal standard, and it is inappropriately applied in the § 1404(a) context. We agree.

The role of the plaintiff's choice of forum in the venue transfer analysis has not been clearly specified in our recent § 1404(a) cases. Indeed, the venue transfer factors that we have adopted do not include a consideration of the plaintiff's choice of forum at all, as these factors address only the convenience of parties and witnesses and the interests of justice. Our earlier § 1404(a) cases, however, specified the appropriate role of the plaintiff's choice of forum in the venue transfer analysis.

[7] In *Humble Oil & Ref. Co. v. Bell Marine Serv., Inc.,* we noted that a plaintiff's choice of forum is to be treated "as a burden of proof question rather than one of a presumption." 321 F.2d 53, 56 (5th Cir.1963); *see also Time, Inc. v. Manning,* 366 F.2d 690, 698 (5th Cir.1966) ("At the very least, the plaintiff's privilege of choosing venue places the burden on the defendant to demonstrate why the forum should be changed."). The weight given to a plaintiff's choice of forum, then, corresponds with the burden that a moving party must meet to demonstrate that a transfer should be granted under § 1404(a).

*4 We now turn to consider the cases that address the appropriate weight to be given to a plaintiff's choice of forum.

In *Veba-Chemie A.G. v. M/V Getafix,* we explained that the "heavy burden traditionally imposed upon defendants by the forum non conveniens doctrine--

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

dismissal permitted only in favor of a *substantially more convenient alternative*--was dropped in the § 1404(a) context." 711 F.2d 1243, 1247 (5th Cir.1983) (emphasis added). We also have repeatedly acknowledged the Supreme Court's directive that § 1404(a) was "intended to permit courts to grant transfers upon a lesser showing of inconvenience" than that required in the forum non conveniens context. [FN2] We therefore hold that the district court erred in requiring Volkswagen to show that the balance of convenience and justice substantially weighs in favor of transfer.

Establishing only this point, however, leaves us without a dismissal standard; we must still determine the proper degree of deference to be given to a plaintiff's choice of forum.

[8] We have, as outlined below, several conflicting panel opinions addressing the proper degree of deference to be given to a plaintiff's choice of forum. When panel opinions appear to conflict, this court must follow the earlier opinion. *Modica v. Taylor,* 465 F.3d 174, 183 (5th Cir.2006). But dicta, of course, is not binding authority. *United States v. Barnes,* 761 F.2d 1026, 1033 n. 14 (5th Cir.1985).

In our earliest case mentioning a defined weight to be given a plaintiff's choice of forum in the § 1404(a) context, *Rodriguez v. Pan Am. Life Ins. Co.,* we noted that a plaintiff's choice of forum is "highly esteemed." 311 F.2d 429, 434 (5th Cir.1962) (noting also that "transfers to other federal courts are quick and ready tools for our trial courts under 28 U.S.C. § 1404(a)"), *vacated on other grounds by Pan-Am. Life Ins. Co. v. Rodriguez,* 376 U.S. 779, 84 S.Ct. 1130, 12 L.Ed.2d 82 (1964). *Rodriguez,* however, is a forum non conveniens case. *Id.* at 432. We have found two other Fifth Circuit cases that, citing *Rodriguez,* note that a plaintiff's choice of forum is highly esteemed: *Time, Inc. v. Manning,* 366 F.2d 690, 698 (5th Cir.1966), and *Peteet v. Dow Chem. Co.,* 868 F.2d 1428, 1436 (5th Cir.1989).

In *Humble Oil,* a case that followed *Rodriguez* by less than a year, we noted that, in contrast to the forum non conveniens context, "the avoidance of dismissal through § 1404(a) lessens the weight to be given the choice of forum factor" and that "he who seeks the transfer must show good cause." 321 F.2d at 56. We further noted that the deference owed the plaintiff's choice of forum did "no more than cast[ ] the burden of proof" on the moving party. *Id.* at 57. *Humble Oil* involved a motion for transfer under the now-amended Admiralty Rule 54. The portion of the rule under consideration provided that a district court "may, in its discretion, transfer the proceedings to any district court for the convenience of the parties." *Id.* at 54. The *Humble Oil* court referenced and applied § 1404(a) analysis as the admiralty rule, like § 1404(a), provided for a discretionary transfer. *Id.*

*5 This court has also held that "unless the balance is strongly in favor of the defendant" the plaintiff's choice should rarely be disturbed. This formulation first appeared in *Marbury-Pattillo Constr. Co. v. Bayside Warehouse Co.,* 490 F.2d 155, 158 (5th Cir.1974). In *Bayside Warehouse* we referred to a 1947 Supreme Court case and observed that "[i]n *Gulf Oil Corp. v. Gilbert,* the Supreme Court elucidated upon the factors justifying a Section 1404(a) change of venue, but it was careful to point out that '[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.' " *Id.* (internal citation omitted). *Bayside Warehouse* is a § 1404(a) case. But *Gilbert,* which was cited for the proposition that the balance must "strongly favor" the defendant, is not a § 1404(a) case. In fact, *Gilbert* is a forum non conveniens case, and it was decided in 1947, before Congress had even enacted § 1404(a). See *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). *Bayside Warehouse,* then, is grounded in an error, or at least in an unexplained conflation of the forum non conveniens analysis with that appropriate to § 1404(a). And this conflation seems to directly contradict the Supreme Court's directive that § 1404(a) was "intended to permit courts to grant transfers upon a lesser showing of inconvenience" than that required in the forum non conveniens context. *Norwood,* 349 U.S. at 32, 75 S.Ct. 544.We have found one other Fifth Circuit case that, citing *Bayside Warehouse,* notes that a plaintiff's choice of forum is strongly favored:*In re McDonnell-Douglas Corp.,* 647 F.2d 515, 517 (5th Cir.1981).

Again, when panel opinions appear to conflict, this court must follow the earlier opinion. *Modica,* 465 F.3d at 183. But dicta, as we have noted, is not binding authority. *Barnes,* 761 F.2d at 1033 n. 14. The discussion of § 1404(a) presented in *Rodriguez* is dicta, as the case was decided on forum non conveniens grounds. The discussion of § 1404(a) presented in *Humble Oil* is arguably dicta, as Admiralty Rule 54 applied rather than § 1404(a). But

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

removing the discussion of § 1404(a) from *Humble Oil* would leave no basis for the decision reached by the *Humble Oil* court. Further, the language of the two rules is indistinguishable in any relevant way. This being so, we understand this panel to be bound by the *Humble Oil* decision. And as *Humble Oil* preceded *Bayside Warehouse,* to the extent that these two opinions conflict, we again find ourselves bound by *Humble Oil.*

**\*6** Apart from the rules governing controlling decisions, we are assured in this holding by additional considerations. First, the "highly esteemed" and "strongly favored" standards referenced above each suffer from significant defects. "Highly esteemed" is so vague as to be unworkable. "Strongly favored," though not vague as a statement, would have to be understood in the light of the Supreme Court decision in *Norwood,* which provided that § 1404(a) was "intended to permit courts to grant transfers upon a lesser showing of inconvenience" than that required in the forum non conveniens context. 349 U.S. at 32, 75 S.Ct. 544. We would therefore have to give content to "strongly favored" without referencing the distinction between change of venue cases and the forum non conveniens cases from which the standard derives. This consideration, then, renders "strongly favored" vague in the context of applying § 1404(a).

Second, and more generally, under either of these standards, we would need to reconcile the content that might be given to these standards with our holding that "dismissal permitted only in favor of a *substantially* more convenient alternative--was dropped in the § 1404(a) context," *Veba-Chemie A.G.,* 711 F.2d at 1247 (emphasis added), and with our holding that "broader discretion" is to be exercised in the § 1404(a) context than in the forum non conveniens context, *S. Bus Lines,* 172 F.2d at 948, and with our holding that " § 1404(a) liberalized and extended the doctrine of forum non conveniens," *Ex parte Chas. Pfizer,* 225 F.2d at 721. In sum, we would not survive a walk through the legal minefield of trying to reconcile either the "highly esteemed" or "strongly favored" standards--which are derived primarily from forum non conveniens cases--with the language of § 1404(a), which provides for transfer "[f]or the convenience of parties and witnesses, in the interest of justice."

Third, and consequently, the standard presented in *Humble Oil* is most consistent with the language and with the intended purpose and effect of § 1404(a), which simply provides that a district court may transfer any civil action "[f]or the convenience of parties and witnesses, in the interest of justice." [FN3]

**\*7** We agree, then, with the contention that the district court erred in requiring Volkswagen to show that the balance of convenience and justice substantially weighs in favor of transfer. Plaintiff's choice of forum is entitled to deference. Indeed, this deference establishes the burden that a moving party must meet in seeking a § 1404(a) transfer. But the appropriate standard for this burden is that established by *Humble Oil.* Namely, a party seeking a transfer "must show good cause." When viewed in the light of § 1404(a), to show good cause means that a moving party must demonstrate that a transfer is "[f]or the convenience of parties and witnesses, in the interest of justice." When the transferee forum is no more convenient than the chosen forum, the plaintiff's choice should not be disturbed. When the transferee forum is clearly more convenient, a transfer should be ordered.

Nevertheless, we sympathize with the district court in the instant case because our precedents have not been the model of clarity. Thus, although we hold that the district court erroneously applied the stricter forum non conveniens dismissal standard, we need not decide whether this error alone warrants mandamus relief in this case, as we decide this petition on other grounds.

B.

Volkswagen also argues that the district court abused its discretion in failing properly to consider and apply the private and public interest factors. Specifically, Volkswagen argues that, although the district court correctly enumerated these factors, the court abused its discretion by failing meaningfully to analyze and weigh them. We agree, for the reasons given below. [FN4]

1.

[9] The first private interest factor to be considered is the relative ease of access to sources of proof. The district court observed that all of the documents and physical evidence relating to the accident are located in the Dallas Division. The district court found, however, that this factor does not weigh in favor of transfer as this factor has become less significant within venue transfer analysis because of advances in

2007 WL 3088142                                                                                                      Page 7
--- F.3d ----, 2007 WL 3088142 (5th Cir.(Tex.))
**(Cite as: 2007 WL 3088142 (5th Cir.(Tex.)))**

copying technology and information storage. Volkswagen asserts that this approach unilaterally reads the sources of proof requirement out of the § 1404(a) analysis, and this despite the fact that this court has recently reiterated that this factor is to be considered. See *In re Volkswagen I*, 371 F.3d at 203 (listing factors and citing cases).

The district court was certainly correct that advances in copying technology and information storage affect the access to sources of proof, and that district courts should consider the actual convenience or inconvenience of accessing sources of proof. But, that access to some sources of proof presents a lesser inconvenience now than it might have absent recent developments does not render this factor superfluous. Here, all of the documents and physical evidence relating to the accident are located in the Dallas Division, as is the collision site. The district court erred in applying this factor because it does weigh in favor of transfer, although its precise weight may be subject to debate.

[10] The second private interest factor to be considered is the availability of compulsory process to secure the attendance of witnesses. The district court observed that its subpoena power of non-party witnesses would be subject to motions to quash. As in *In re Volkswagen I*, the non-party witnesses located in the city where the collision occurred "are outside the Eastern District's subpoena power for deposition under Fed.R.Civ.P. 45(c)(3)(A)(ii)." *Id.* at 205 n. 4. And any "trial subpoenas for these witnesses to travel more than 100 miles would be subject to motions to quash under Fed.R.Civ.P. 45(c)(3)." *Id.* All of the witnesses in this case reside more than 100 miles from the Marshall Division. The district court discounted its lack of absolute subpoena power based on its ability to deny a motion to quash and ultimately to compel the attendance of third-party witnesses found in Texas, subject to reasonable compensation.

Volkswagen asserts that the district court's analysis falls short. We agree. A proper venue that does enjoy *absolute* subpoena power for both depositions and trial--the Dallas Division--is available. As we noted above, and as § 1404 clearly indicates, venue transfer analysis is concerned with convenience. That the district court can deny any motions to quash does not address concerns regarding the convenience of parties and witnesses. Indeed, this rationale simply asserts that a district court, at some burden to the parties, will likely be able to enforce an option that is inconvenient to witnesses. This factor, then, also weighs in favor of transfer.

*8[11] The third private interest factor is the cost of attendance for willing witnesses. The district court noted that Volkswagen did not submit sufficient information for the court to determine which of its witnesses were "key" witnesses whose convenience was more important. The district court also noted that given the proximity of Dallas, where all witnesses reside, to the Marshall Division, the cost of having witnesses attend a trial in Marshall would be minimal. The district court consequently found that this factor does not weigh in favor of transfer.

Volkswagen, however, submitted a list of potential witnesses that included the third-party defendant, accident witnesses, accident investigators, treating medical personnel, and the medical examiner--all of whom reside in Dallas. Volkswagen also submitted two affidavits, one from an accident witness and the other from the accident investigator, that stated that traveling to the Marshall Division would be inconvenient. Volkswagen also asserts that the testimony of these witnesses, including an accident witness and an accident investigator, is critical to determining causation and liability in this case. It would certainly appear that these witnesses are important to Volkswagen's case.

In *In re Volkswagen I* we set a 100-mile threshold as follows: "When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." 371 F.3d at 204-05. [FN5] We said, further, that it is an "obvious conclusion" that it is more convenient for witnesses to testify at home and that "[a]dditional distance means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which fact witnesses must be away from their regular employment." *Id.* at 205. The district court abused its discretion by ignoring the 100-mile rule. The court did note, however, that Dallas is approximately 155 miles from the Marshall Division. Given the rule established in *In re Volkswagen I,* it is clear that this factor favors transfer.

2.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 3088142                                                                      Page 8
--- F.3d ----, 2007 WL 3088142 (5th Cir.(Tex.))
**(Cite as: 2007 WL 3088142 (5th Cir.(Tex.)))**

**\*9**[12] The only contested public interest factor is the local interest in having localized interests decided at home. Regarding this factor, the district court stated: "There is a local interest in resolving this litigation among the residents of the Dallas Division ... because the automobile accident occurred there. Furthermore, because the Defendant has brought a third-party claim against ... [a Dallas resident], residents of the Dallas Division ... have an interest in a case involving one of their fellow residents that arose out of an accident within the [Dallas] Division. As the Plaintiffs point out, however, the citizens of Marshall also have an interest in this product liability case because the product is available in Marshall. Therefore, this factor is neutral."

Further, with respect to the unfairness of burdening citizens in an unrelated forum with jury duty, [FN6] the district court noted that although the accident occurred in the Dallas Division, the citizens of Marshall would be interested to know whether there are defective products offered for sale in close proximity to the Marshall Division and whether they are being exposed to these products. The district court therefore held that this factor weighs against transfer.

These findings stand in stark contrast to our analysis in _In re Volkswagen I._ There, under virtually indistinguishable facts, we held that this factor weighed heavily in favor of transfer. _In re Volkswagen I,_ 371 F.3d at 205- 06. Here again, this factor weighs heavily in favor of transfer: the accident occurred in the Dallas Division, [FN7] the witnesses of the accident live and are employed in the Dallas Division, Dallas police and paramedics responded and took action, the Volkswagen Golf was purchased in Dallas County, the wreckage and all other evidence is located in Dallas County, two of the three plaintiffs live in the Dallas Division (the third lives in Kansas), and the third-party defendant lives in the Dallas Division. Indeed, there is no relevant factual connection to the Marshall Division.

The district court's provided rationales--that the citizens of Marshall have an interest in this product liability case because the product is available in Marshall, and that for this reason jury duty would be no burden--stretch logic in a manner that eviscerates the public interest that this factor attempts to capture. The district court's provided rationales could apply to virtually any judicial district and division in the United States; they leave no room for consideration

of those actually affected--directly and indirectly--by the controversies and events giving rise to a case. Thus, the district court committed a clear abuse of discretion. [FN8] Moreover, the facts do not favor the logic presented. The record indicates that the Volkswagen Golf was purchased from a location in the Dallas Division, and that Marshall, Texas, has no Volkswagen dealership. But again, the larger point is the one we emphasize: that a product is available within a given jurisdiction is insufficient to neutralize the legitimate local interest in adjudicating local disputes.

IV.

**\*10** Having considered each of the relevant private and public interest factors, we hold that, under a proper application of these factors, no relevant factor favors the Singletons' chosen forum. Further, and for the reasons given above, we hold that the district court abused its discretion by failing to order transfer of this case. The petition for mandamus is GRANTED and the case is REMANDED with instructions that it be transferred to the Northern District of Texas, Dallas Division.

PETITION FOR MANDAMUS GRANTED and CASE REMANDED WITH INSTRUCTIONS.

> FN1. While we have not indicated that the factors that we have enumerated are exhaustive or exclusive, the failure to live with some precision the test we have set out necessarily produces inconsistent results in this Circuit. Absent exceptional circumstances, the district courts of the Fifth Circuit must consider motions to transfer under the rubric we have provided.

> FN2._Norwood v. Kirkpatrick,_ 349 U.S. 29, 32, 75 S.Ct. 544, 99 L.Ed. 789 (1955); _see, e.g., Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees of Am., Div. No. 1127 v. S. Bus Lines,_ 172 F.2d 946, 948 (5th Cir.1949) (noting that forum non conveniens "[d]ismissal for inconvenience is not to be visited except when the choice of forum is a real hardship, or an imposition on the court. But here again we meet the Revision of Title 28.... Transfer is a less drastic matter than dismissal, for it involves no loss of time or pleading or costs; and no doubt a broader discretion may be exercised in ordering it."); _Ex parteChas. Pfizer,_ 225 F.2d at 722 (5th

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 3088142
--- F.3d ----, 2007 WL 3088142 (5th Cir.(Tex.))
(Cite as: 2007 WL 3088142 (5th Cir.(Tex.)))

Page 9

Cir.1955) (noting that the "doubt that may have at one time existed as to whether § 1404(a) liberalized and extended the doctrine of forum non conveniens" has been put to rest by the Supreme Court in *Norwood.*);*Humble Oil*, 321 F.2d at 56 (5th Cir.1963) (noting that the "avoidance of dismissal through § 1404(a) lessens the weight to be given the choice of forum factor, and to that extent broadens the discretion of the District Court"); *Dubin v. United States*, 380 F.2d 813, 816 (5th Cir.1967) ("Its purpose is to determine the most convenient forum from among two or more possibly correct ones. In substance, § 1404 is the statutory enactment of the doctrine of forum non conveniens tempered to allow transfer rather than dismissal."); *Ellis v. Great Sw. Corp.*, 646 F.2d 1099, 1103 n. 4 (5th Cir.1981) ( "Section 1404(a) is a revision rather than just a codification of forum non conveniens. It permits federal courts to grant transfers on a lesser showing than is required under the common law doctrine and there is no need for pleadings or documents to be refiled in the transferee court. The relevant factors, however, are the same.").

FN3.*See Norwood*, 349 U.S. at 31, 75 S.Ct. 544 (" 'The forum non conveniens doctrine is quite different from Section 1404(a). That doctrine involves the dismissal of a case because the forum chosen by the plaintiff is so completely inappropriate and inconvenient that it is better to stop the litigation in the place where brought and let it start all over again somewhere else. It is quite naturally subject to careful limitation for it not only denies the plaintiff the generally accorded privilege of bringing an action where he chooses, but makes it possible for him to lose out completely, through the running of the statute of limitations in the forum finally deemed appropriate. Section 1404(a) avoids this latter danger. *Its words should be considered for what they say, not with preconceived limitations derived from the forum non conveniens doctrine.*' " (emphasis added) (quoting *All States Freight v. Modarelli*, 196 F.2d 1010, 1011 (3d Cir.1952))); *see also Van Dusen v. Barrack*, 376 U.S. 612, 622,

624, 636-37, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) (" 'The idea behind § 1404(a) is that where a "civil action" to vindicate a wrong--however brought in a court--presents issues and requires witnesses that make one District Court *more convenient* than another, the trial judge can, after findings, transfer the whole action to the more convenient court.' This remedial purpose--the individualized, case-by-case consideration of convenience and fairness--militates against restricting the number of permissible forums within the federal system .... The power to defeat a transfer to the convenient federal forum should derive from rights and privileges conferred by federal law and not from the deliberate conduct of a party favoring trial in an inconvenient forum .... We believe, therefore, that both the history and purposes of § 1404(a) indicate that it should be regarded as a federal judicial housekeeping measure, dealing with the placement of litigation in the federal courts and generally intended, on the basis of convenience and fairness, simply to authorize a change of courtrooms." (emphasis added) (quoting *Cont'l Grain Co. v. The Barge FBL-585*, 364 U.S. 19, 26, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960))); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) ("The statute was designed as a 'federal housekeeping measure,' allowing easy change of venue within a unified federal system." (quoting *Van Dusen*, 376 U.S. at 613, 84 S.Ct. 805)).

FN4. We address only the private and public interest factors that are contested by the parties. Several of the factors clearly weigh neither for nor against transfer, as the parties acknowledge and as is often the case.

FN5. The Singletons argue that *Jarvis Christian Coll. v. Exxon Corp.* indicates that 150 miles is not substantial. 845 F.2d 523, 528 (5th Cir.1988). In *Jarvis Christian*, this court declined to vacate a venue transfer because the *defendant* would have had to travel 203 miles. *Id.Jarvis Christian* did not discuss *witness* inconvenience.

FN6. The private and public interest factors

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

that we have adopted for venue transfer analysis were first presented in a forum non conveniens case. *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); see also Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 n. 6, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)* (listing the same factors for forum non conveniens analysis). As presented in *Gilbert* and *Piper Aircraft,* the public interest factors included a factor not reflected in all of the opinions of this court: the unfairness of burdening citizens in an unrelated forum with jury duty. *See Gulf Oil, 330 U.S. at 508-09, 67 S.Ct. 839; see also Piper Aircraft, 454 U.S. at 241 n. 6, 102 S.Ct. 252.* We have, however, acknowledged that this concern is relevant to § 1404(a) analysis. *Koehring Co. v. Hyde Constr. Co., 324 F.2d 295, 296 (5th Cir.1963)* (noting that "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation"); *In re Volkswagen I, 371 F.3d at 206* (same). We now incorporate this concern into the factor now under consideration.

FN7. The district court, introducing a distinct factor not provided by this court's § 1404(a) cases, noted that the place of the alleged wrong is in the Dallas Division and that this factor weighed slightly in favor of transfer. The place of the alleged wrong is a consideration that properly can be considered within the analysis of the local interest in having localized interests decided at home.

FN8.*In re Volkswagen I* spoke directly to this in finding abuse of discretion and granting mandamus against a refusal to transfer venue: "Plaintiffs have failed to demonstrate and the Eastern District Court has failed to explain how the citizens of the Eastern District of Texas, where there is no factual connection with the events of this case, have more of a localized interest in adjudicating this proceeding than the citizens of the [transferee district], where the accident occurred and where the entirety of the witnesses for the third-party complaint can be located. Arguably, if Plaintiffs had alleged that the Volkswagen vehicle was purchased from a Volkswagen dealer in Marshall, Texas, the people of that community might have had some relation, although attenuated, to this litigation; but as it stands, *there is absolutely nothing in this record to indicate that the people of Marshall, or even of the Eastern District of Texas, have any meaningful connection or relationship with the circumstances of these claims.*" 371 F.3d at 206 (emphasis added).

--- F.3d ----, 2007 WL 3088142 (5th Cir.(Tex.))

END OF DOCUMENT